[No. 36510-0-I.    Division One.    September 9, 1996.]

SVETLANA ZENKINA, *Appellant*, v. SISTERS OF
PROVIDENCE IN WASHINGTON, INC., *Respondents*.

*Gregg L. Tinker* and *Longfelder Tinker Kidman, Inc., P.S.*; and *Keith T. McClelland*, for appellant.

*Timothy D. Blue, Mary H. Spillane*, and *Williams Kastner & Gibbs*, for respondent Sisters of Providence in Washington, Inc.

*John C. Graffe, D. Jeffrey Burnham*, and *Rosenow-Johnson-Graffe-Keay-Pomeroy-Moniz*, for respondents Emergency Room Physicians, Inc., and Randal Bensen.

KENNEDY, A.C.J. — Svetlana Zenkina appeals the summary judgment dismissing her negligence claim against Sisters of Providence and others for injuries sustained

when she fainted in the emergency room while observing her nephew receiving stitches. We conclude that under the facts here presented, the medical care providers had no duty to prevent Zenkina from fainting or to warn her that she might faint while watching the medical procedure. Accordingly, we affirm.

## FACTS

On September 9, 1992, 10-year-old Roman Kolesnik fell while riding his bicycle and cut his chin. His father Vladimir Kolesnik brought him to the home of Svetlana Zenkina, Roman's aunt. Zenkina drove them to the emergency room at Providence Hospital for treatment. Zenkina, who is a Ukrainian immigrant, speaks better English than Vladimir and Roman, both of whom speak very little English. In the past, Zenkina had transported friends and family members to the emergency room and provided translation assistance.

When they entered the emergency room, Svetlana explained to Vladimir that someone from the hospital would come and ask for information. She then sat down to wait. When a person from the hospital began to ask Vladimir questions, he waived to Zenkina and requested that she assist him. Svetlana answered the person's questions, and then again sat down with Vladimir and her nephew. A few minutes later, a woman who worked for the hospital requested that Vladimir provide her with information to be put into the computer, and he again requested that Zenkina translate for him. Zenkina answered all of the questions. The woman then took Zenkina, Vladimir, and Roman to another area where there was a television and instructed them to wait.

After a few more minutes the name Kolesnik was called and Roman and Vladimir went into another room. Zenkina stayed behind in the television room. The woman returned shortly, asked Svetlana to "please come," and explained that it would be better if she were with the boy

so that they could "communicate better." Zenkina accompanied the woman into a room where Vladimir and Roman were waiting. The three were then shown into the suturing room.

In the suturing room, Vladimir and a hospital employee helped Roman onto the table. Dr. Randal Bensen, a physician employed by Emergency Room Physicians, Inc., which had an agreement to provide emergency room services at the hospital, entered and apologized for the delay. Dr. Bensen asked Vladimir to stand at the foot of the table and to hold his son's legs. Dr. Bensen assumed that Zenkina was Roman's mother and understood that she was acting as a translator. He asked Zenkina to stand near Roman's head in order to help interpret. In her deposition, Zenkina testified that Dr. Bensen asked her to hold Roman's hands to restrain him in case the child attempted to move suddenly. Zenkina did not protest, and put her hand on top of Roman's hands to comfort him. When Dr. Bensen opened Roman's wound to clean it, Zenkina fainted, striking her head on the floor. She suffered a concussion, convulsions, nausea, headaches, and other injuries, and was hospitalized for five days as a result.

Zenkina brought a negligence action against Sisters of Providence in Washington, Inc., Dr. Bensen, and Emergency Room Physicians, Inc., alleging that they owed her a duty to warn her of the risks associated with observing the medical procedure, including the risk of fainting.[1]

Respondents moved for summary judgment, arguing that there was no duty on their part to prevent Zenkina from fainting because she was not a patient and because no hospital employee directed her to aid in Roman's treatment. Respondents also argued that Zenkina voluntarily assumed the risk of remaining in the suturing room with her nephew. Judge Castleberry granted the Respondents'

---

[1]Zenkina further alleged that the Respondents owed her a duty to not violate a hospital rule which she claimed prohibited the presence of a nonpatient in the emergency room and the involvement of a nonpatient in a medical procedure. The Respondents denied the existence of any such rule. This issue has not been raised in this appeal.

motion for summary judgment, dismissed Zenkina's claim, and ordered her to pay statutory costs and attorney fees. Zenkina's motion for reconsideration was denied. This timely appeal followed.

## DISCUSSION

In reviewing an order of summary judgment, the appellate court engages in the same inquiry as the trial court and considers the facts in the light most favorable to the nonmoving party. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 226, 770 P.2d 182 (1989). Summary judgment will be granted if the record demonstrates that there is no genuine issue as to any material fact, *Seven Gables Corp. v. MGM/UA Entertainment Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986), and that the moving party is entitled to judgment as a matter of law, CR 56(c); *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

Premises Liability Theory

■■ Zenkina first contends that the Respondents, as owners and occupiers of the emergency room, owed her a duty of reasonable care to prevent her from fainting. In a negligence action, the threshold question is whether the defendant owes a duty of care to the plaintiff. *Kelly v. Falin*, 127 Wn.2d 31, 36, 896 P.2d 1245 (1995) (citing *Christen v. Lee*, 113 Wn.2d 479, 488, 780 P.2d 1307 (1989)). The existence of a legal duty is a question of law. *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 220, 802 P.2d 1360 (1991).

■ In actions involving premises liability, the plaintiff's status as either an invitee, licensee, or trespasser determines the scope of the duty of care owed by the owner or occupier of the property. *Anderson v. Weslo, Inc.*, 79 Wn. App. 829, 834, 906 P.2d 336 (1995) (citing *Tincani v. Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 128, 875 P.2d 621 (1994)). The Washington Supreme Court has adopted the RESTATEMENT (SECOND) OF TORTS definition of

invitee: an invitee, as a business visitor, is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land. *Younce v. Ferguson*, 106 Wn.2d 658, 667, 724 P.2d 991 (1986). Zenkina entered the hospital for the purpose of obtaining care for her injured nephew, and providing care to injured persons is the business of the hospital. Therefore, Zenkina was an invitee.[2] An invitee is owed a duty of ordinary care. *Younce*, 106 Wn.2d at 667. Ordinary care requires maintaining premises in a reasonably safe condition, *Radford v. City of Hoquiam*, 54 Wn. App. 351, 360, 773 P.2d 861 (1989), and the affirmative duty of discovering any dangerous conditions, *Egede-Nissen v. Crystal Mountain, Inc.*, 93 Wn.2d 127, 132, 606 P.2d 1214 (1980) (citing RESTATEMENT (SECOND) OF TORTS § 343, cmt. b (1965) (invitee entitled to expect possessor will discover any latent defects and to give such warning that the visitor may decide intelligently whether to accept the invitation or to protect herself against the danger if she does accept the invitation).

■ Maintaining a hospital in a reasonably safe condition should include making sure that the floors, entryways, stairs, and other physical elements of the building are in good condition, preventing the escape of noxious substances, providing adequate lighting and otherwise preventing defects in the premises which could cause injury to an unsuspecting or distracted invitee. In contrast, to require a hospital to prevent every non-patient who enters the emergency room from fainting would exceed the level of ordinary care afforded invitees. To impose such an unreasonable burden would require busy emergency room personnel to attend to the nearly impossible task of ensuring that all who enter are kept from any sight, smell, or sound with the potential to cause them

---

[2]This is consonant with the findings of other courts. "Courts generally classify those who accompany patients to a hospital emergency room to provide them 'comfort' as being invitees." Annotation, *"Liability of Hospital for Injury to Person Invited or Permitted to Accompany Patient During Emergency Room Treatment,"* 90 A.L.R.4TH 478, 481 (1991).

to faint. The only practical solution would likely be banning all non-patients from the emergency room, an undesirable result given the comfort and support provided by friends and family members of injured and sick patients. *Cf. O'Hara v. Holy Cross Hosp.*, 137 Ill. 2d 332, 341, 561 N.E.2d 18, 90 A.L.R.4th 465 (1990). Zenkina points to no case law requiring such a duty.

We conclude that that the Respondents did not owe Zenkina the duty to protect her from fainting merely because she was an invitee on hospital premises.

### Participation In Patient Care Theory

Zenkina next contends that the Respondents owed her a duty to protect her against fainting or to warn her of the risk because, she alleges, they requested and directed her to assist in Roman's care. Zenkina argues that this court should adopt the holding in *O'Hara v. Holy Cross Hosp.* that a hospital that invites a nonpatient to participate in the care and treatment of a patient has a duty to protect the nonpatient from fainting during the treatment. *O'Hara*, 137 Ill. 2d at 340. Zenkina contends that by asking her to translate and to hold Roman's hands, the Respondents invited her to participate in Roman's care and treatment and, therefore, had a duty to protect her from fainting.

Respondents contend that they had no duty to protect Zenkina, relying on the cases of *McElwain v. Van Beek*, 447 N.W.2d 442 (Minn. Ct. App.), *review denied*, (1989) and *Sacks v. Thomas Jefferson Univ. Hosp.*, 684 F. Supp. 858 (E.D. Pa.), *aff'd*, 862 F.2d 310 (3d Cir.) (1988). Respondents further argue that the rule announced in *O'Hara* would not change the outcome in this case because Zenkina did not participate in Roman's care and treatment in that she did not wipe blood or fluids, handle instruments, or touch his wound.

In *O'Hara*, a mother brought her son to the emergency room for treatment of a facial laceration. *O'Hara*, 137 Ill. 2d at 335. The nurse invited the mother to accompany the

boy into the treatment room. The mother claimed that during the suturing of the boy's wounds, the attending physician asked her to take a piece of gauze and wipe the Novocain from her son's mouth while the nurse lifted the covering from the boy's face. *Id.* at 336. The physician testified that the mother insisted on standing near her son after being asked to move away, and that she was instructed to use a sterile towel only after she had already attempted, of her own accord, to wipe the boy's mouth. While observing the suturing procedure, the mother fainted and injured herself. The *O'Hara* court first rejected the plaintiff's claim that the hospital owed a duty to protect a nonpatient from fainting who merely accompanies a patient into the emergency room and remains during treatment. *Id.* at 340. The *O'Hara* court concluded that to impose such a duty would place an enormous and potentially impossible burden on hospitals, would require hospital resources to be diverted from patients, and would likely require emergency rooms to bar nonpatients from emergency rooms entirely. *O'Hara*, 137 Ill. 2d at 341. That result, the court held, would be undesirable because nonpatients often provide comfort, consolation and support to patients. *Id.*

The *O'Hara* court held, however, that a hospital emergency room *does* have a duty to protect a nonpatient from fainting *if* the hospital invites the nonpatient to participate in the care and treatment of the patient. *Id.* at 342. The court reasoned that once a nonpatient becomes actively involved in emergency room procedures, the likelihood that the nonpatient will become ill increases, and concluded that imposing this particular duty on hospitals would not be onerous because hospitals should not expect nonpatient bystanders to assist with medical procedures in any event. *O'Hara*, 137 Ill. 2d at 342.

The *O'Hara* court determined that an issue of fact remained as to whether the defendant hospital invited the mother to participate in the care and treatment of her son, because the hospital contended that the mother

volunteered to wipe her son's mouth, while the mother claimed that she was asked to do so by the attending physician. *Id.* at 343. Accordingly, the court remanded the case for trial.

In *Sacks v. Thomas Jefferson Univ. Hosp.*, 684 F. Supp. 858, a mother brought her daughter to the emergency room for stitches on the child's forehead. *Sacks*, 684 F. Supp. at 859. The mother was permitted, but not invited, to remain with her daughter. During the treatment, the doctor asked the mother to hold her daughter's head. While observing the suturing, the mother fainted and injured herself. *Id.* The *Sacks* court ruled that the hospital could not be held liable for the injuries because the mother was not a patient at the hospital, and because she voluntarily entered the treatment room and held her daughter's head (although she was asked to do so) and, therefore, assumed the risk that she might faint. *Id.* at 859-860. The *Sacks* court declined to impose a duty, reasoning that the mother stayed in the treatment room because of her parental responsibility and not because of an identifiable relationship with the hospital. The mother in *Sacks* argued that since the hospital asked her to assist in the treatment, she was placed in a situation which created a risk of harm to her, thereby creating a duty of care on the part of the hospital to protect her from fainting. The *Sacks* court disagreed, distinguishing the case from situations in which the plaintiff is a servant to the hospital, and stating that "[a]t no time was [the mother] under the direction and control of the defendant." *Id.* at 860.

In *McElwain v. Van Beek*, 447 N.W.2d 442, the plaintiff and her mother were permitted to remain in the emergency room while the plaintiff's younger brother was being treated for a cut on his nose. *McElwain*, 447 N.W.2d at 444. The plaintiff was standing next to her brother holding his hand when the doctor administered a local anesthetic to the boy. The plaintiff fainted and injured herself. The Court of Appeals of Minnesota held that the facts of that case did not fit into a "duty to warn" or "duty to control" situation

because the threat of danger did not originate from the patient. The court also concluded that the plaintiff was not a patient and that liability was, therefore, not properly based on a medical malpractice theory. The *McElwain* court noted that its decision was in accord with *Sacks. Id.* at 446.

■ Zenkina argues that this court should adopt the reasoning of *O'Hara*, and that by asking her to come into the suture room and to stand near her nephew and hold his hands, as well as to translate, the emergency room personnel invited her to participate in her nephew's medical treatment. We disagree; therefore, we do not reach the question of whether a hospital which invites a nonpatient to participate in the medical treatment of a patient has a duty to protect the nonpatient from fainting during the treatment. Asking a family member or friend who accompanies a patient, particularly a child patient, to comfort the patient, even to help restrain him or her if the patient is indeed a child, is not the same as asking the family member or friend to participate in the medical treatment of the patient. Neither is asking the family member or friend to translate, in cases such as this one in which a language barrier exists, the same as asking that person to participate in the medical treatment of the patient. Zenkina was not asked to perform any medical procedures but only to comfort and restrain the child by holding his hands and by speaking in a language with which the child was familiar. Such acts of human kindness may well enhance the ability of emergency room personnel to treat a frightened child, but there is nothing inherent in such acts which is likely to increase the likelihood of fainting, and nothing resembling participation in the medical procedures themselves. Indeed, imposing a duty in this situation would likely require hospitals to bar all nonpatients, even parents of young, frightened children from emergency rooms, for nothing that Zenkina did was materially different from what any parent or surrogate parent likely would be asked to do in a similar situation.

Although the record reflects that perhaps a dozen relatives accompanying patients to this emergency room faint or become lightheaded in the course of a year, so that the risk of relatives fainting is certainly foreseeable, the risk is also obvious. To require hospitals to *prevent* relatives from fainting would be to require hospitals to bar them from the emergency room altogether. To require hospitals to *warn* relatives of the risk that they might faint at the sight of blood or at the sight of some medical procedure such as suturing or the giving of an injection would be to require hospitals to warn of a risk that is so well known as to require no warning at all. We decline to impose a duty to warn of a risk as obvious as this one.

As between Zenkina and the emergency room personnel, Zenkina was in the better position to know whether she is one of those people who may faint at the sight of blood or at the sight of some medical procedure such as suturing or the giving of an injection.

Viewing all the facts of this case in the light most favorable to Zenkina, we conclude that the Respondents were entitled to judgment in their favor as a matter of law. The trial judge did not err.

Affirmed.

AGID and ELLINGTON, JJ., concur.

Review denied at 131 Wn.2d 1003 (1997).